6/25/00

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FILED
U.S. DISTRICT COURT
ST_____ ___ ARYLAND

: 008 JUN 30 P 2: 00

CLERK'S OFFICE
AT BALTIMORE

_____DEPUTY

UNITED STATES OF AMERICA

v.                                              Crim.No.94-206-WDQ

ANTHONY D. HAWKS
          Defendant

## MOTION TO HAVE THIS MOTION AMENDED TO MY PREVIOUS BRIEF

Now Comes, Anthony D. Hawks, thanking this Honorable Judge and Court
for appointing the Federal Defenders Office to represent me.  I'd also
like to thank you for continuing a motion on my behalf, regarding the
new Crack Law 2 - point reduction.  Your Honor, please forgive  me
I don't know the law that well,  but another issue has recently been
brought to my attention.  Back in 1994 my trial attorney was Mr. Rombro
I remember telling him that the amount of drugs allegedly found were only
enough to support personal use.  That amount was less than one gram.  I .
                                  STATE - COURT -
was charged with simple possession ⌃ but when the Federal Government took
control of prosecuting me for those same drugs, I was charged with posse-
ssion with intent to distribute and I was found guilty.  I've written to
Mr. Rombro in the past, but he never responded to my letters also,
On May 26, 1994 I was- - -see Ex F-1 - - - - - - - - - - - - - - - - -

*in crack-coriane - 1- Less Than 1 gram*

indicted in Federal Court for possession of Heroin with Intent to

Distribute.   Then On August 22, 1994 I was Found Guilty for the Heroin. *on 8-22-94*

*crack-coriane* It was for one bag of Heroin(less than 1 gram). In Federal Court see

Exhibit pg _82_  Officer Timms did state that a hangun, money an a bag

of heroin was found in a mans shoe in Mr. Hawks bedroom On 1/8/94.

Note: This charge originally came from state court.   I was tried
*Ex pg-29-30*
on March 14, 1994 three months prior to the Federal Trial.   This same
*3-14-94*
heroin , I was charged in state court with possession &  I was found
*The-heroin " "*
not guilty. see part 2  transcript page 49 to 54 that day, the

prosecutor said there is no evidence to link Mr. Hawks to this heroin
*in-coriane*
and I was found not guilty. This same heroin now in the Federal Trial *Ex pg 82*

*Newly-evidence*  *"*  Not: In 1998 Officer Timms gave *Fed-Civil* Deposotion in a Lawsuit he said *pg-39*

I was searching in Mr. Hawks bedroom an stated, he found money in a
*Ex pg 82*
shoe, the same shoe stated in Federal Court on August 22, 1994. But *Ex pg 39*

now there is no gun and no heroin in the shoe. *Sec-Fed-Civil deposition- on-6-19-98-officer timms*
*Fed-court*
Also I would like the Court to know on page 5 and 6 July 7th the

prosecutor told the Federal judge I was never tried for these charges, *see*

*Part-2- Pg* in State Court on 3/14/94- also the prosecutor knew that I was a drug
*29-54*
user, she was at my bail hearing on May 31, 1994. When the Pre-Trial
*Fed-court*
officer mentioned I had came up possitive for cocaine. The amount of *Ex A-3*

drugs ofund in my Home was less than a gram and just enough for per-

sonal use. *Sec - State - court- on - 3-14-94 - Part - 2 - pg - 49 to 54 - in Sec-pg-35 to 37-in*
     *Also see- State-court- pg-29-to 30- officer Timms. said I Found- money & a gun in the bedroom -*

## Legal Argument

Mr. Hawks now contents and claims that the Honorable Court fail to

acknowledge the fact that the heroin found in his house was for person

-al use and could not be counted as relevant conduct pursuant to

(2)

<u>United States v. Gill</u>, 348 F.3d 147 (6th Cir. 2003).
With reference to U.S. Sentencing Guidelines Manual's language which
the United States Court of Appeals for the Sixth Circuit hesitates to
describe as "Plain," although it is unequivocal --- a defendant's
possession of drugs for personal use cannot be considered an act that
occurred during the commission of the offense of conviction, in
preparation for that offense, or in the course of attempting to avoid
detection or responsibility for the offense under U.S. Sentencing
Guidelines Manual § 1B1.3 (A)(1) where the offense of conviction re-
quired an intent to distribute to accompany the act of drug possession
under 21 U.S.C.S. § 841 (A). Possessing drugs for personal use is not
part of or connected to the commission of, preparation for, or con-
cealment of the distribuiton-type offense. Simple possession is not
"relevant" under U.S. Sentencing Guidelines Manual § 1B1.3 (A)(2), as
part of the same course of conduct or common scheme or plan because
that section applies only if the two offenses can be grouped under
U.S Sentencing Guidelines Manual § 3D1.2 (d). Simple possession is
not one of the crimes listed in this grouping rules that triggers the
application of that relevant conduct section. Simple possession of
illegal drugs for personal use is not conduct that is "relevant" to
charge of possesion with intent to distribute a controlled substance
for the perpose of determining a sentence range under the Sentencing
Guideline Manual. Amounts possessed for personal consumption should
not be included when calculating the amount of drugs to enter into
drug quanity table in U.S. Sentencing Guideline Manual § 2D1.1 (c) 21
U.S.C.S. § 841 (A)(1) does not criminalize mere possession of drugs.

(3)

unprofessional errors, the result of the proceeding would have been different.

> Criminal Law 46.4 ineffective Counsel
> Counsel can deprive a defendant of the right to effective assistance of counsel simply by failing to render adequate legal assistance by failing to challenge and/or object to the presentence report or Court's attribution.

A sentencing proceeding is sufficiently like a trial in its adversarial format and in the existence of standards for decision, that counsel's role in the proceeding is comparable to counsel's role at trial for the purpose of determining constitutionally effective assistance of counsel.

Counsel should have objected at sentencing to the crack cocaine and heroin based on the personal use in U.S. V. Gill, 384 F.3d 147,153(6th Cir.2003) and introduced into evidence exhibits (A) page #3.

Any deficiencies in criminal defense counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the constitution. Counsel knew that the crack cocaine was for personal use, because Mr. Hawks came up positive for cocaine at the bail hearing. Also the fact Mr. Hawks Counsel was ineffective prescribed in Strickland v. Washington, and that his deficient performance prejudiced Mr. Hawks sentencing. Mr. Hawks base offense level should have been 32.

### Petitioner Summary

The United States Sentencing Commission has prescribed a methodogy that trial courts must use to determine a sentencing range in a criminal case. A key ingredient of the sentencing formula in drug cases is the

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA                              *

     v.                                                              *        Criminal No.  WDQ-94-206

ANTHONY D. HAWKS                                      *
# 30149-037
                                            *



* * * * * * *

## O R D E R

Pending is a paper filed by Anthony D Hawks, proceeding pro se, requesting a reduction of

sentence based on the retroactive application of Amendment No. 706 to the United States Sentencing

Guidelines related to cocaine base ("crack") offenses.  The paper shall be construed as a motion for

reduction of sentence pursuant to 18 U.S.C. §3582(c).  Upon review of the paper, it is this 10th day

of June, 2008, hereby ordered by the United States District Court for the District of Maryland that:

1.    The paper IS CONSTRUED as a motion pursuant to 18 U.S.C. §3582(c);

2.    The Clerk SHALL PROVIDE a copy of this order and the 18 U.S.C. §3582(c)
      motion to:  the Federal Public Defender for the District of Maryland; the United
      States Attorney for the District of Maryland; and the United States Probation Office;

3.    The Federal Public Defender for the District of Maryland is appointed to
      PRELIMINARILY REVIEW the motion and PROVIDE a status report within thirty
      days; and

4.    The Clerk SHALL SEND a copy of this order to defendant.


                                       _____/s/_____
                                       William D. Quarles, Jr.
                                       United States District Judge

## COUNT FOUR

And the Grand Jury for the District of Maryland further charges that:

On or about January 8, 1994, in the State and District of Maryland,

### ANTHONY D. HAWKS

the defendant, herein, knowingly and intentionally used and carried a firearm, to wit, a Spanish-made, "Velo Dog" 6.35 millimeter, five shot revolver, Serial Number FA920, during and in relation to a drug trafficking crime for which he could be prosecuted in a court of the United States, to wit: possession with intent to distribute a quantity of a mixture or substance containing a detectable amount of cocaine base, a Schedule II narcotic controlled substance and possession with intent to distribute a quantity of a mixture or substance containing a detectable amount of heroin, a Schedule I narcotic controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

18 U.S.C. §924(c)

*Lynne A. Battaglia*
_____
Lynne A. Battaglia
United States Attorney

A TRUE BILL:

*Martha W. Riddle*
_____
Foreperson                    5-26-94

Ex8-Pg-4

0000010

Officer Timms    Fed wt Aug-22-1994    EX-82

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA          )

                                  )

                                  ) NO. S-94-0206  CRIMINAL

                                  )

ANTHONY D. HAWKS                  )


AUGUST 22, 1994


BALTIMORE, MARYLAND


THE ABOVE ENTITLED CASE CAME ON FOR TRIAL BEFORE THE
HONORABLE FREDERIC N. SMALKIN WITH A JURY AT 10:00 A.M.


A P P E A R A N C E S


FOR THE GOVERNMENT:

    JAMIE M. BENNETT, ESQ.


FOR THE DEFENDANT:

    ALLAN H. ROMBRO, ESQ.

EX 82
1 OF 2

Officer - Timms
* * * * * Fed - Court - Aug-22-1994

1   SHOES, A BROWN MAN'S SHOE I BELIEVE.

2   Q    WHAT TYPE OF SHOE WAS IT?  A BOOT?  A SNEAKER?

3   A    A LOAFER, I BELIEVE.  I AM NOT SURE.  I BELIEVE IT WAS A

4   BROWN SHOE.

5   Q    CAN YOU ESTIMATE WHAT SIZE IT MIGHT HAVE BEEN BASED ON

6   THE SIZE OF YOUR OWN FEET?

7   A    BIGGER THAN -- I AM A SIZE 9.  I BELIEVE IT WAS BIGGER

8   THAN A SIZE 9, BUT I AM NOT SURE.

9   Q    NOW, WHAT WAS IN THE SHOE -- TELL ME AGAIN WHAT WAS IN

10  THE SHOE?

11  A    THERE WAS A SMALL REVOLVER AND SOME MONEY AND I BELIEVE

12  A BAG OF HEROIN WAS ALSO IN THE SHOE.

13  Q    I AM GOING TO SHOW YOU WHAT WE HAVE ALREADY ADMITTED

14  INTO EVIDENCE AS GOVERNMENT'S EXHIBIT 1, AND ASK YOU IF YOU

15  RECOGNIZE THAT?

16  A    YES, MA'AM; THAT IS THE REVOLVER OFFICER PHIPPS

17  RECOVERED OUT OF THE SHOE.

18  Q    DO YOU RECALL WHAT AMOUNT OF CASH WAS FOUND IN THE SHOE

19  WITH THAT GUN?

20  A    PERSONALLY, NO, MA'AM; I DON'T.

21  Q    WERE YOU ALSO WITH OFFICER PHIPPS WHEN HE RECOVERED A

22  SAFE?

23  A    YES, MA'AM.  I FOUND THE SAFE, AND I DIRECTED -- YOU

24  KNOW, I CALLED OFFICER PHIPPS TO THE HALL CLOSET ON THE SECOND

25  FLOOR.  THE SAFE WAS TAKEN BY OFFICER PHIPPS OUTSIDE.

EX37
1 of 7

STATE OF ........................................ COURT
.................................................... CITY

vs.

ANTHONY DWIGHT HAWKS          :CR. 484020B4

- - - - -

BEFORE:     THE HONORABLE C. YVONNE HOLT-STONE, Judge

- - - - -

HEARING DATE:     March 14, 1994

- - - - -

APPEARANCES:

For the State:              LARRY DAVID, Esquire

For the Defendant:          JAMES S. SALKIN, Esquire

*Official Times pg 29-30*

Transcriptionist           Nancy B. Hertkorn

Transcription              AccuScribes Transcription
Services                   P.O. Box 5337
                           Baltimore, MD  21209-0337
                           Phone:  (410) 367-3838

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

*EX 29-30 & STATE COURT
1 OF 6        3-14-94*



Accurate & Dependable Reporters
Legal Video Specialists
Days - (410) 494-8300

ART
MILLER
& Associates
COURT REPORTERS

Top... Turnaround Time
Immediate-Daily-Expedited
Eves. - (410) 367-3833





# DISTRICT COURT OF MARYLAND FOR Baltimore City
Located at 5800 Wabash Avenue, Baltimore, MD 21215

Case No.: 485020B4

### STATE OF MARYLAND
**COMPLAINANT**
Officer: DAVID PHIPPS
Agency/Subagency: AD 5908
ID: E128

VS   HAWKS, ANTHONY DWIGHT
aka hawks anthony dewight
2712 west baltimore street
baltimuore, MD 21223

CC#: 8A05732    SID:                         Local ID#: 223-965
Eyes: BRN    DL#:
Race: 1    Sex: M    Ht: 5 11 Wt: 222  Hair: BLK
DOB: 01/13/56  Phone(H): ( )  -
                        Phone(W): ( )  -

## CHARGE SUMMARY

UPON THE FACTS CONTAINED IN THE APPLICATION OF DAVID PHIPPS
IT IS FORMALLY CHARGED THAT HAWKS, ANTHONY DWIGHT
at the dates, times, and locations stated in the Charging Document:

| CHG/CIT | STATUTE | PENALTY | DESCRIPTION OF CHARGE |
|---|---|---|---|
| 3 0233 | 27 286 | 20 Y &/or $25,000.00 | NARC-POS W/I MANU/DIS/DISP |
| 4 3550 | 27 287 | 4 Y &/or $25,000.00 | CDS:POSSESSION |
| 4 3550 | 27 287 | 4 Y &/or $25,000.00 | CDS:POSSESSION |
| 3 0233 | 27 286 | 20 Y &/or $25,000.00 | NARC-POS W/I MANU/DIS/DISP |
| 1 0239 | 27 286 | 5 Y &/or $15,000.00 | CDS MAINT COM NUIS/MAKE |
| 1 0239 | 27 286 | 5 Y &/or $15,000.00 | CDS MAINT COM NUIS/MAKE |
| 2 3599 | 27 290 |  | CDS ATTEMPT,CONSPIRACY |
| 2 3599 | 27 290 |  | CDS ATTEMPT,CONSPIRACY |
| 1 0487 | 27 281A | 20 Y | CDS: DISTR ETC. W/FIREARM |
| 1 0487 | 27 281A | 20 Y | CDS: DISTR ETC. W/FIREARM |
| 1 5409 | 27 286C | 20 Y &/or $20,000.00 | HIRE ETC MINR DEL/DIST CDS |

Officer- Phipps
STATe - Court - 3-14-1994

Date: 01/09/94  Time: 00:34:02    Judicial Officer: _Robert George_    1242
8726

INDEX OF WITNESSES

| WITNESS: | DIR | CR | RD | RC | FD | FC |
|---|---|---|---|---|---|---|
| OFFICER TIMMS | 25 | 32 | | | | |

- - - - -

INDEX OF EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| | None marked | |

- - - - -



Accurate & Dependable Reporters
Legal Video Specialists
Days - (410) 494-8300

ART
MILLER
& Associates
COURT REPORTERS

Tops in Turnar
Immediate Df
Eves. - (4

*Exc*

3.

1    MR. DAVIS: These are the two from this

2   morning. The others are going to be preliminary. These

3   are really the last matters of substance, if I may use

4   that term.

5        The State from the 9 o'clock docket will call

6   the matter of Anthony Hawks, 485020B4.

7        THE COURT: Witnesses please step forward.

8   Any witnesses.

9        If you had all these witnesses, this case

10  should have been special set. What do you have, like ten,

11  twelve witnesses?

12       MR. SALKIN: Well, eleven. Six people in the

13  house.

14       THE COURT: Six people.

15       MR. SALKIN: I think we should really start

16  the case, if I may speak, with the suppression hearing on

17  the search and seizure warrant. That may end this matter.

18  Hopefully.

19       If not, then we will be set, that's my

20  suggestion.

21       THE COURT: You want to suppress the search

*Accurate & Dependable Reporters*
*Legal Video Specialists*
Days - (410) 494-8300


**ART**
**MILLER**
*& Associates*
**COURT REPORTERS**

*Tops in Turnaround Time*
*Immediate-Daily-Expedited*
Eves. - (410) 367-3833

1          Q    Officer, you said you testified that the

2    substance was recovered from the toilet.  Was that

3    recovered by you?

4          A    Yes sir, it was.

5          Q    I'm sorry, we, what it was that came out of

6    the toilet?

7          A    Four ziplock bags of crack cocaine.

8          Q    What did you do with that substance after

9    recovering it?

10         A    I gave it to Officer Phipps and told him

11    where it was recovered from.

12         Q    Is the individual that you testified you saw

13    trying to flush them down the toilet, is he in the

14    courtroom?

15         A    Yes sir, he's seated at trial table right at

16    defense counsel.

17         Q    After recovering the substance, what if any

18    action did you take at that point?

19         A    I searched the rest of the premises.

20         Q    What did you recover?

21         A    I recovered a handgun and some money out of

Ex 29 to 30

Officer - Timms - 3-14/94
STATE - Court



Accurate & Dependable Reporters
Legal Video Specialists
Days - (410) 494-8300

ART
MILLER
& Associates
COURT REPORTERS

Tops in Turnaround Time
Immediate-Daily-Expedited
Eves. - (410) 367-3833

out of Mr. Hawks' bedroom.

Q    How did you know it was Mr. Hawks' bedroom?

A    I asked, because of the paperwork found in the bedroom.

Q    Do you remember what, if anything, (inaudible).

A    No sir, I don't.

MR. SALKIN:  Objection, move to strike.

THE COURT:  Sustained.

Q    Did there come a time, who else did you see, again excluding the members of your raiding party, who, if anyone else, did you see in the house after seeing Mr. Anthony Hawks?

A    Mrs. Hawks. *see F-17-78*

Q    Where did you first see Mrs. Hawks?

A    In the front bedroom.

Q    What, if anything, was Ms. Hawks doing when you first saw her?

A    Nothing, there was an officer already with her.

Q    Does Mr. Hawks live at the premises?



Accurate & Dependable Reporters
Legal Video Specialists
Days - (410) 494-8300

ART
MILLER
& Associates
COURT REPORTERS

Tops in Turnaround Time
Immediate-Daily-Expedited
Eves. - (410) 367-3833

STATe-COUIT 3-14-1994

IN THE DISTRICT COURT FOR BALTIMORE CITY
CR. 484020B4 (Part 2 0f 2)/Tape 3 & 4

STATE OF MARYLAND vs. ANTHONY DWIGHT HAWKS

BEFORE:          The Honorable C. Yvonne Holt-Stone, Judge

HEARING DATE:    March 14, 1994

APPEARANCES:

    For the State:        Larry David, Esquire

    For the Defendant:    James S. Salkin, Esquire

Transcriptionist:    Brenda Lewis

1 oF 9 - Pg
EX PART- 2
Pg- 29 To 54
Pg- 35 To 37
Pg- -72 - Judge

783    **Officer Timms:**    She was already, uh... when we first come up, she uh... after we'd

784    taken Mr. Hawks outside, she was in the other bedroom with uh... I believe Josephine

785    Zillman.  And she was taken downstairs also.

786    **JUDGE:**    So, you don't know what she was doing at the time?

787    **Officer Timms:**    No ma'am. No I don't.

788    **JUDGE:**    So you don't know what she was doing at the time Officer Zillman

789    entered the room?

790    **Officer Timms:**    No ma'am I don't.

791    **JUDGE:**    Anything else?

792    **The Court:**    State will call Officer David Phibbs to the stand.  Officer, your name and

793    assignment for the record please.

794    **Officer Phibbs:**    Officer David Phibbs, Southwest District, Drug Enforcement

795    Unit.

796    **The State:**    Officer I want to draw your attention to January 8, 1994.  Were you

797    involved in a raid, 2712 West Baltimore Street?

'98    **Officer Phibbs:**    Yes I was.

'99    **The State:**    Okay, did there come a time where uh... Officer Timms gave you

STATe-Court- 3/14/94
4 Officer-Phibps    Exhibit 29 To 54  in-see-pg-35 To 37 in pg 72

50

| 800 | | an substance? |
| --- | --- | --- |
| 801 | **Officer Phibbs:** | Yes there was. |
| 802 | **The State:** | Okay, where about, was that? |
| 803 | **Officer Phibbs:** | It was in the up stairs, the hallway right outside the bathroom. |
| 804 | **The State:** | What did you do with that substance? |
| 805 | **Officer Phibbs**: | Uh..., eventually I took it down stairs with all the other seized |
| 806 | | property and then it was delivered to evidence control for analysis. |
| 807 | **The State:** | Okay, was it in your custody? |
| 808 | **Officer Phibbs:** | Yes it was. |
| 809 | **The State:** | All the time. |
| 810 | **Officer Phibbs:** | Yes. |
| 811 | **The State:** | From the time Officer Timms gave it to you, the time it was |
| 812 | | submitted? |
| 813 | **Officer Phibbs:** | Yes it was. |
| 814 | **The State:** | What did uh... result come back indicating? |
| 815 | **Officer Phibbs:** | Came back canine based schedule 2. |
| 816 | **The State:** | Officer is several different uh.. On the analysis, several items listed. |

Exhibit (A) of (3) pages

817     What was it that Officer Timms gave you?

818     **Officer Phibbs:**     He gave me the first item listed, 4 zip loc bags of white rock

819     powder.

820     **The State:**     And the State got all frame the evidence.  State 1 analysis sub for

821     substance given to Officer Phibbs by Officer Timms and submitted to lab, indicating the

822     fact it was positive for cocaine.

823     **JUDGE:**     Any objection?  I think this shows more than that.

824     **Mr. Salkin:**     (Inaudible answer) Your Honor, I ask that the rest of the stuff be

825     sponged or......

826     **JUDGE:**     No, I'm not looking at the first.

827     **Mr. Salkin:**     Thank you.

828     **The State:**     I have no further questions.

829     **Mr. Salkin:**     I have no questions.

830     **JUDGE:**     Thank you, you may step down.  Next State's case.

831     **The Court:**     Yes, your Honor it is.

832     **Mr. Salkin:**     I like to make a motion for Judge of acquittal.  I guess really sought

833     of have to go through things a little bit.  Get this statement and charges for both, let's

Exhibit (8) of (8) pages

EX15

Ex.533

533

| Line | Speaker | Text |
|---|---|---|
| 851 | **The State:** | Correct, your Honor, 9 and 10 for felonies were already known per |
| 852 | | us. |
| 853 | **JUDGE:** | They were........ and 11. |
| 854 | **The State:** | Correct. |
| 855 | **JUDGE:** | If they weren't, would you null posse this objection, or would check |
| 856 | | null. |
| 857 | **The State:** | Judge any felony still remaining would be no problem. |
| 858 | **JUDGE:** | Alright. Only thing remaining is possession of cocaine. |
| 9 | **Mr. Salkin:** | Yes, your Honor. I'd like to argue on that just a few minutes from |
| 860 | | now, if I can just relieve the worries of a wife for a second before I go back. |
| 861 | **JUDGE:** | You think you can do that uh.... |
| 862 | **Mr. Salkin:** | I think so. |
| 863 | **JUDGE:** | Go on. |
| 864 | **Mr. Salkin:** | I'm now going to direct the Court's attention to the way Janenere |
| 865 | | Hawks, I make a motion on each and every count of the State of the charges is to go |
| 866 | | testimony that she deserves going (inaudible response) a person, controlled dangerous |
| 867 | | substances, scheduled 2 (cocaine), count 2 has already been **null posse**. |

54<u>4</u>

868            I like to direct the Court's attention to count 3, which is did posse

869    heroin schedule 1, dangerous substances, no evidence of that back.  Count 7,

870    conspiracy, no evidence about that.

871            I'm not sure about count 9.  Count 9 also uh..?  I think count 9 is

872    also null posse.  I think that remaining count's 1, 3, and 7, I think are remaining counts.

873    If I'm wrong please advise.

874    **The State:**    No, you're offense Counsel.

875    **JUDGE:**    David.

876    **Mr. David:**    Judge uh.. STATE would tend to argue that there's constructive

877    possession, that she's in the house.  That she's and in the uh..., she's part of the

878    warrant in the house.

879    **JUDGE:**    Where's she in the warrant?  If she were, it wouldn't matter.

880    **Mr. Salkin:**    She not in the warrant, it's just the house.

881    **The State:**    I'll submit on.....

882    **JUDGE:**    There's no evidence that she even lives there.

883    **The State:**    Judge there was in the warrant that uh...

884    **JUDGE:**    But the warrant is not subject to her relate.

763    Mr. Salkin:    Well, had I known that he might be potentially have been a witness, I

764    made a motion for sequestration of witnesses. I don't know who, you know, I don't know

765    who the State, who the members of the raiding party are, and I don't, just like you don't

766    know, I don't know cause I wasn't there, and I don't know, apparently it was a number of

767    people, but he was not just a incidental spectator in the court room, he 's a member of the

768    raiding party.

769

770    JUDGE:    We ask all witness to step forward and all witness step forward.

771

772    The State:    **Judge, he's not my witness, therefore, if he's a witness, he's the**

773    **defenses witness.**

774

775    JUDGE:    You don't know your own witness, Mr. Salkin.

776    Mr. Salkin:    Judge, that names the issue. The issue is he is a witness to the event

777    that took place on January....

778

779    JUDGE:    Well it wasn't to all witness to the event.... it was all witnesses who

780    testified. Those are the ones that we sequestered.

781

782    Mr. Salkin:    I understand that, but I made a motion for sequestration of witnesses,

783    I didn't know that it was a person of the raiding party sitting in the court room, as compared

784    to the Southwest District patrolman, you know is here to return a warrant or something.

37

| | | |
|---|---|---|
| 742 | **Mr. Salkin:** | Well, I would ask that he be sequestered from this point forward. |
| 743 | | |
| 744 | **JUDGE:** | Why? |
| 745 | | |
| 746 | **Mr. Salkin:** | Because he may be called by the defense as a witness. (inaudible)... |
| 747 | | inside the house, not just somebody inside the court room not interested in the case, he an |
| 748 | | interested party. Wasn't he part of the raiding team? |
| 749 | | |
| 750 | **The State:** | **I don't know.....** |
| 751 | | |
| 752 | **Mr. Salkin:** | I don't know either..., well Judge.., can you step outside please. |
| 753 | | |
| 754 | **JUDGE:** | Okay, you said you might call him. |
| 755 | **The State:** | **Officer Kramer.....(inaudible)** |
| 756 | | |
| 757 | **JUDGE:** | Oh, don't discuss this case with anybody. |
| 758 | | |
| 759 | **Mr. Salkin:** | Judge, I think a motion for a mistrial with prejudice. |
| 760 | | |
| 761 | **JUDGE:** | Why, you're not a witness, we only ask all witness to be sequestered. |
| 762 | | |

36

Exhibit (C)

1528    **JUDGE:**         That would be a nightmare...., then you have to undo it..

1529

1530    **The State:**      No I understand, before in the passing been a setback without a date, that's

1531    fine your Honor, that's fine.

1532

1533    **JUDGE:**          To be set...

1534    Now you can bring all the witnesses in, and I have to tell them not to discuss the case...

1535

1536    This case is going to be postponed until a date in April.  We do not have the date yet, all

1537    persons who are witnesses are told by this Court that they are not to discuss this case with

1538    anyone, and you are either Officer Frame even thought you haven't be sworned as a witness

1539    but you were in the courtroom.  You are not to discuss this case with anybody, is that clear?

1540    Alright you all will received summons in the mail.  Thank you.

1541

1542    **Mr. Salkin:**     Thank you, Honor.

1543

1544    **The State:**      Thank you Gentleman.

1545

1546

*The Court - Judge    Ex P3-72*

*State - Court - 3-14-1994*

72

**In The Matter Of:**

*Anthony D. Hawks, Jr. v.*
*Christopher Timms, et al.*

---

*Christopher Timms*
*Vol. 1, June 19, 1998*

---

*Riggleman, Turk & Nelson*
*The World Trade Center*
*401 East Pratt Street*
*Suite 425*
*Baltimore, MD 21202*
*(410) 539-6398    FAX: (410) 576-7207*

*Original File 16075tic.prn, 50 Pages*
*Min-U-Script® File ID: 3828093692*

**Word Index included with this Min-U-Script®**

Christopher Case 1:04-cv-00272-WDQ  Document 99  Filed 06/10/2008  Page 25 of 32 ...ms, Jr. v.
Vol. 1; June 19  8  Office ...  ...ngt...r, Simms, et al.

EX 9

**Page 36**

[1] Q: Okay. Was the toilet flushing at that time?

[2] A: Yes, sir.

[3] Q: And the – what kind of drugs were –

[4] A: Bags of crack cocaine.

[5] Q: Okay. And the bags were going down the toilet?

[6] A: Yes, sir.

[7] Q: Did you try to grab them out of there?

[8] A: Did I personally, no, I didn't try to grab them.

[9] Q: Did anybody?

[10] A: I don't know. [11] It was a really violent struggle at that point in [12] time. Mr. Hawks is a big guy, and when he starts throwing, [13] swinging punches –

[14] Q: So it's, you, Sergeant Able, and Officer Adkins?

[15] A: Best as I can recall, yes.

[16] Q: Okay. And you're struggling with Mr. Hawks?

[17] A: Right.

[18] Q: All right. What happened? [19] In as much detail as you can, what happened?

[20] A: The best I recall, he was fighting with us, [21] throwing punches and everything.

**Page 37**

[1] We attempted to gain control of him and pull him [2] away from the toilet at the same time in order to protect the [3] evidence. We pulled him out of the bathroom and, the best I [4] recall, put him in the – pulled him out of the bathroom and [5] got him in another room where he continued to fight and, [6] you know, after a struggle, he was handcuffed.

[7] Q: Was anybody else in that room?

[8] A: I, I don't remember.

[9] Q: Okay. He continued to – so you dragged him out of [10] the bathroom, and you brought him into another room?

[11] A: (Nodding head affirmatively.)

[12] Q: How far away was that room from the bathroom?

[13] MR. BIXLER: Objection to the form. [14] You can answer.

[15] A: I don't recall. I don't remember.

[16] Q: Okay. And he continued to struggle?

[17] A: Yes, sir.

[18] Q: Okay. Were you throwing punches at Mr. Hawks?

[19] A: Throwing punches? [20] No.

[21] Q: No?

**Page 38**

[1] What were you doing during this

time?

[2] A: Trying to just gain control of his hands, get [3] handcuffs on him.

[4] Q: Did you hit him with anything?

[5] A: No.

[6] Q: You didn't hit him with like a billy club or [7] anything like that?

[8] A: No.

[9] Q: No?

[10] A: (Shaking head negatively.)

[11] Q: Okay. Who put the handcuffs on him?

[12] A: I don't recall who did. [13] All three of us from the best – it took all three [14] of us to get him handcuffed.

[15] Q: Whose handcuffs were they, though?

[16] A: I don't recall.

[17] Q: Okay, all right. [18] What happened after you handcuffed him?

[19] A: After he was handcuffed, he, he was taken [20] downstairs to a secure area, the people had cleared on the [21] first floor, there was a couch there, and then I

**Page 39**

[1] stayed upstairs and searched the rest of the house.

[2] Q: Anybody else search with you?

[3] A: Yeah.

[4] Q: Who was that?

[5] A: There was a whole bunch of, of – like I said, the [6] whole unit, from I recall were there; myself and Adkins and [7] Able, and I believe Officer Fitzgerald was also up there.

[8] Q: Okay. So where did you search first?

[9] A: The whole upstairs in general.

[10] Q: Were you assigned a particular room?

[11] A: We just started at one and worked our way around.

[12] Q: You were all in the same room, or did you split the [13] rooms up?

[14] A: I really don't remember.

[15] Q: Okay. What did you find up there personally?

[16] A: I remember finding money in, in a shoe. NO, MAN-SHOE-NO drugs

[17] Q: Do you recall how much?

[18] A: No.

[19] Q: Okay. What else did you find?

[20] A: I'm not sure who found the guns. I believe they [21] found – Officer Phipps may have found a safe with a gun in

**Page 40**

[1] it, and then someone else found another gun up there. I think [2] there was two handguns found up there, but I

[1] A: ...iet, ...ed...t personally.

[2] Q: Did you find any drugs?

[3] A: I believe they recovered some out of the toilet.

[4] Q: Did you? Did you find any drugs?

[5] A: I don't remember.

[6] Q: So you weren't – you didn't find any – you didn't [7] find the drugs that were flushed down the toilet, you [8] personally?

[9] MR. BIXLER: Objection.

[10] A: No, I don't recall who personally recovered them.

[11] Q: But it wasn't you, is that what you're saying?

[12] A: It may have been. [13] Like I said, I really don't remember.

[14] Q: You don't remember?

[15] A: No, I've done a lot of – involved in a lot of [16] stuff since then.

[17] Q: Did you find any other drugs other than the drugs [18] flushed down the toilet?

[19] A: Me personally – I, I know there was drugs

**Page 41**

[1] recovered, but I don't know who found them.

[2] Q: Okay. After you searched the upstairs, then what [3] did you do?

[4] A: Basically, me personally, what I did –

[5] Q: Umh-humh.

[6] A: – I went back to the station and helped [7] Officer Phipps with the paperwork.

[8] Q: Did you search any of his cars, any of Mr. Hawks' [9] cars?

[10] A: I think Officer Phipps did.

[11] Q: Did you?

[12] A: I don't recall. [13] I may have assisted when – whoever needs help, [14] you go out and help them. So I may have – I'm not going to say I [15] did or I didn't because I don't recall.

[16] Q: Okay. Did you search the downstairs at all?

[17] A: No, I didn't search the downstairs, I know that.

[18] Q: How about the basement? Did you search the [19] basement?

[20] A: I don't believe – I don't recall if there was one, [21] or I don't think I did.

**Page 42**

[1] Q: Okay. Do you know – do you remember who was [2] arrested that night, or day?

[3] A: I mean, what time was it, by the way? I'm not even [4] sure.

[5] A: It was pretty much like the morn-

Exhibit (9) of (1) page

H - COP

1

IN THE U.S. DISTRICT COURT
FOR THE DISTRICT OF MARYLAND


UNITED STATES OF AMERICA )
                         )
                         )
VS.                      )   CRIMINAL ACTION NO. S-94-0206
                         )
                         )
ANTHONY D. HAWKS         )



JULY 7, 1994

BALTIMORE, MARYLAND



        THE ABOVE-ENTITLED MATTER CAME ON FOR HEARING ON
MOTIONS TO SUPPRESS BEFORE THE HONORABLE FREDERIC N. SMALKIN
AT 3:00 P.M.




              A P P E A R A N C E S


ON BEHALF OF THE GOVERNMENT:

        JAMIE M. BENNETT, ESQ.


ON BEHALF OF THE DEFENDANT:

        STANLEY NEEDLEMAN, ESQ.
        JAMES SALKIN, ESQ.


              E X C E R P T

1-OF-24

EX PG - 5 TO 7) Fed-court

EX 25

1    MR. NEEDLEMAN: SIR, IT'S NOT CONTAINED IN THE FOUR

2    CORNERS OF THE WARRANT.

3    THE COURT: IT DOESN'T MATTER. IF THEY KNEW HIM TO

4    HAVE A RECORD, THE GUN IS THEN CONTRABAND IN HIS POSSESSION,

5    ISN'T IT?

6    MR. NEEDLEMAN: NOT NECESSARILY.

7    THE COURT: NO? UNDER WHAT AUTHORITY? IF THEY KNOW

8    HIM TO HAVE A FELONY RECORD, THEN HIS POSSESSION OF THE GUN

9    VIOLATES FEDERAL LAW. IF THE GUN WAS FOUND IN THE COURSE OF

10   THE SEARCH, IT CAN BE SEIZED, CAN'T IT?

11   THE NEEDLEMAN: COULD WE HAVE SEQUESTRATION, PLEASE?

12   IT MIGHT BE TOO LATE.

13   THE COURT: WELL, I THOUGHT I COULD SHORTCUT THINGS.

14   OBVIOUSLY, I CAN'T.

15   MR. NEEDLEMAN: I'M TRYING TO GET TO THE POINT. IF I

16   GIVE YOU WHAT I'M GOING TO SAY, MAYBE THE PERSON WHO IS GOING

17   TO TESTIFY WILL HEAR THIS.

18   THE COURT: WELL, GO AHEAD AND HAVE THE WITNESSES

19   LEAVE THE COURTROOM, THEN.

20   (WITNESSES LEAVE COURTROOM.)

21   THE COURT: BY THE WAY, WHY WAS THIS CASE DISMISSED

22   IN THE STATE COURT?

23   MS. BENNETT: I'M SORRY, YOUR HONOR?

24   THE COURT: WHY WAS THIS CASE DISMISSED IN THE STATE

25   COURT?

EX P3-5 To 7    go-bACK-To PArT 2 STATe-CourT-p2-p9-54

July 7, 94   1×7-12   Federal Court        Officer Phipps 5

Fed-Court-on-7-7-94                          6

1     MS. BENNETT: IT WAS DISMISSED BECAUSE WE ASKED FOR

2   IT TO BE DISMISSED.

3          THE COURT: I SEE. SO, IT DIDN'T REACH TRIAL?

4          MS. BENNETT: YES, IT REACHED TRIAL ON TWO CHARGES OF

5   POSSESSION OF HEROIN AND COCAINE.

6          THE COURT: AND WHAT HAPPENED?

7          MS. BENNETT: THEY GOT, I THINK, PART WAY THROUGH THE

8   TRIAL, AND THEN WE REALIZED THAT THAT TRIAL HAD PROCEEDED, AND

9   WE CALLED THE STATE'S ATTORNEY'S OFFICE AND ASKED THEM TO

10  DISMISS THE CHARGES.

11         THE COURT: WELL, I DON'T LIKE THAT, BUT I DON'T HAVE

12  ANY SUPERVISORY AUTHORITY OVER THAT KIND OF PROSECUTORIAL

13  PRACTICE.

14         MR. SALKIN: JUDGE, MAY I ADDRESS THAT POINT?

15         THE COURT: YES, SIR.

16         MR. SALKIN: I WAS THE TRIAL ATTORNEY FOR MR. HAWKS

17  IN THE DISTRICT COURT CASE. HE WAS BEFORE A DISTRICT COURT

18  JUDGE ON APPROXIMATELY EIGHT TO NINE CHARGES. EITHER THE

19  CHARGES WERE NOL PROSSED OR HE WAS FOUND NOT GUILTY OF EVERY

20  CHARGE. THE REMAINING CHARGE WAS POSSESSION OF COCAINE, WHICH

21  WAS SCHEDULED FOR TRIAL ON SOMETHING LIKE MAY THE 29TH, 1994,

22  WHEREUPON HE WAS PICKED UP ON THE FEDERAL CHARGES. THAT CASE

23  WAS THEN NOL PROSSED, TOO.

24         THE COURT: WELL, AS YOU WELL KNOW, THE FEDERAL

25  GOVERNMENT HAS THE POWER TO DO THIS. THE SUPREME COURT AND

LIE

5-7

July 7, 94                    7-7          Officer Phipes

7

1   THE COURT OF APPEALS LET THEM DO IT, AND I HAVE GOT TO LET

2   THEM GO AHEAD WITH IT. THERE'S NO WAY I CAN STOP IT. THAT'S

3   JUST THE WAY IT IS. SO, WE ARE GOING TO GO AHEAD WITH IT.

4   THAT'S THE WAY IT IS.

5        MR. NEEDLEMAN:  YOUR HONOR, WOULD YOU MIND IF

6   SOMETIMES I STAND INSTEAD OF BEING SEATED?

7        THE COURT:  I DON'T MIND.

8        MR. NEEDLEMAN:  I DON'T WANT TO BE RUDE.

9      • THE COURT:  IT SEEMS TO ME, THOUGH, PARTICULARLY

10  EGREGIOUS TO STOP A STATE PROSECUTION IN THE MIDDLE OF THE

11  THING.

12       MR. NEEDLEMAN:  YOUR HONOR, IT HAPPENS EVERY DAY.

13       THE COURT:  AND IT'S NOT GOING TO CHANGE, NO MATTER

14  HOW --

15       MR. NEEDLEMAN:  I CAN NAME FIVE CASES RIGHT IN THIS

16  COURT RIGHT NOW.

17       THE COURT:  NO MATTER HOW MISERABLE A PRACTICE IT

18  SEEMS, IT'S JUST NOT GOING TO CHANGE.

19       ALL RIGHT.  GO AHEAD.

20       MR. NEEDLEMAN:  I THINK MY BOTTOM-LINE ANSWER TO YOU

21  IS CALLED GUIDELINES, SIR.

22       THE COURT:  GO AHEAD.

23       MR. NEEDLEMAN:  IN ANY EVENT, YOUR HONOR, I BELIEVE

24  THAT I DO HAVE AUTHORITY TO -- OBVIOUSLY THE WORD IS LIGHTLY

25  ATTACK THAT PORTION WHEREIN THE ISSUING JUDGE, ISSUING

Ex. May 31st
Fed
W-2

## MAY 31, 1994 FEDERAL BAIL HEARING BEFORE THE HONORABLE JUDGE ROSENBERG

TAP NO. 2 (S94-0206)

1

1) Ms. Bennett: <u>I forgot to mention is that the 38 calbre gun that was in the safe was purchased for defendant by his wife</u>. <u>His wife tells the agents that he paid for the gun and at the time that she purchased the gun</u>, apparently he was there with another male friend of his and both of them looked at and I think the defendant brought a holster at that time.

2) Ms. Bennett: Defendant is continuing to deal drugs and he pose a danger to the community based on that.

2

3) Mr. Salkin: <u>The state charges have been litigated, all but one, and on every single charge he's either been found not guilty or the charges were dismissed by the states's attorney office</u>.

4) Mr. Salkin: It wasn't a gun that you would think of - old rusty gun.

5) Mr. Salkin: I don't know if it's one-shot. Well, whatever it is, its a small, rusty, old type of weapon. The other gun was brought for protection in the house. When they searched the house on Friday, they found a small amount of maryuana; <u>they found large amounts of money</u>. Now, the government alludes to the fact that my client does not have any known job to them. <u>My client works for (LB Automotive). Mr. Holbrook Cohen is here in the courtroom today, and he runs (LB Automotive). He's the gentleman with his arms crossed wearing the dark navy blue t-shirt</u>. And what my client does, he helps and works with Mr. Cohen in the restoration and fixing of automobiles. And what they both do to generate money, is they go out, they read ads in the paper that Mr. Citizen wants to sell his 1988 Oldsmobile 88 and wants $7500 for it. And what they will do is they will go over to Mr. Joe Citizen's house and they'll offer cash in the amount of $4110 rather than having somebody come to the house and want financing for the car and go into a bank. Here people arrive with cash and they buy the cars for cash. They take it

---

1. Ms. Bennett is the U.S. Attorney; 2. Mr. Salkin is defendant's lawyer.

Ex A-pg-3
1 of 3

mix powder in with the liquid which makes whatever color you're
trying to make.

*Prosecutor never said this in trial*

11) Ms. Bennett: And he admitted that his wife had purchased the gun for him but that he had paid for it. *not true/no evidence of that statement*

12) Mr. Salkin: In fact we asked Mr. Tanger[3] to zerox copies of that because when my client keeps telling me that he's buying and selling cars. Mr. Tanger may have the receipts to talk about where the money is coming from rather than just the bold allegation of the government. I haven't seen the receipts and I don't know but he was going to turn them over to the wife the zeroxed copies of the receipts. So apparently ther've got some kind of receipts.

13) Mr. Tanger: Judge, the receipts that Mr. Salkin is speaking of are involved in a folder where there are miscellaneous documents in addition to car titles for the defendant's vehicles, some of the defendant's vehicles. There is not a log-book of receipts or anything that first of all, I've had the opportunity to go through since Friday to make any determination as to whether they were job related or not. There's a couple pf bank deposits, bank deposit slips in sums of cash and there's also some miscellaneous documents in there. I offered to give all that back to his wife or to him to give copies back. But we didn't keep the originals to determine for evidentiary value.

14) Mr. Salkin: I understand that, but what we're saying is, are they receipts? That's all we want to know.

15) Judge Rosenberg: Alright, So you'll be able to analyze them and make sure Mr. Salkin has an opportunity to analyze them properly to see if they can, he can substantiate to what they are.

16) Mr. Murry[4]: Mr. Hawks tested positive for presence of cocaine. He related to Ms. Skidmore[5] that he used maryuiana, however, we did not get a positive reading for maryuana. Secondly, I think its important for the court to know that when Mr. Hawks was paroled on the 1981 conviction, where he received 9 years, he was paroled on November 9 of 87, his subsequent re-arrest and conviction violated

---

3. Mr. Tanger is a (ATF) agent; Number 4 and 5 are (pre-trial) officials

that parole and he was remanded by the Division of Corrections. He is now currently on mandatory release until 1995 due to the 1989 conviction. He's also under 5 years supervised probation from the Baltimore City Circuit Court. That's basically all I want to tell the court. He's lived here all his life. Mr. Skidmore did verify his employment. However, we would be ... if the court wants a recommendation from pre-trial services.

17) Judge Rosenberg: Now did she verify employment from the ...?

18) Mr. Murphy: Only with the automotive company. I don't know. It is written down that he works part-time with the pest company.

19) Judge Rosenberg: And that is part of his drug dealing activities, he carried a firearm for his own protection. So I would have no doubt that the government's case is overwhelming ... In the latest search the small amount of maryuana that was found, apparently, is not of any significance, and may well have only been sufficient for the defendant's personal use. The amount of crack that was discovered may or may not be sufficient if it was for other than the defendant's use. There's a representation made that the large amount of cash was not really drug dealing but was money the defendant had in his home because of his involvement with (LB Automotive) in buying cars for cash, restoring them and then selling them at a profit. There was also some ammunition found which apparently no firearms were found for that ammunition. So that is a factor which in one way helps the defendant that there were no firearms found for that particular ammunition, but the fact that he had the ammunition at home goes the other way which is some evidence which the court feels does weigh against him. It represented however that the cash found is not drug proceeds but was actually money that the defendant was making through legitimate employment. I think that there is an inference that can be drawn that it may have been legitimate funds. One other comment is that his employer who says that it would not be unusual for him to have as much as $10,000 at his home because of the nature of the business, that he's involved in.

---

I DO SWEAR UNDER THE PENALTY OF PERJURY THAT MY TESTIMONY IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND ACQUIRE RECORDS. I ABTHONY D. HAWKS CERTIFY AND AFFIRM SO...

NOTARIAL SEAL
Cathy J. Gebert, Notary Public
Honesdale Boro, Wayne County
My commission expires August 27, 2009